We have two cases scheduled for oral argument this morning, versus United States of America, versus Xiulu Ruan. I see Mr. Sewell is here for the appellant, along with Mr. Lotito. And here for the government, Ms. Raulston. And Mr. Sewell, are you ready to proceed? Yes, Your Honor. Mr. Finlayson is also here on behalf of Ms. Raulston. Good morning. Good morning. May it please the court. My name is Jay Sewell, and I represent Dr. Pat Couch. This morning, I will be addressing the topics covered in our brief, specifically relating to our theory of defense argument, the challenges to Dr. Tricia Altman, and the PDMP evidence. We ask this court to reverse all of Dr. Couch's convictions, and to the extent applicable, we adopt the arguments of Dr. Ruan. The government can't have this case both ways. They can't charge RICO, accuse these doctors of operating a criminal enterprise, and introduce prescription records of essentially all of the doctor's 8,000 patients, to then turn around and claim that the only relevant or admissible evidence in this case related to 14 patient witnesses they identified, or a select few patients they put on a chart or a graph admitted into evidence. While the doctors weren't accused of exclusively prescribing illegally, they should have been allowed to present favorable and admissible evidence to prove and rebut the allegation that they were not primarily or essentially a pill mill. Some of the most powerful evidence in this case were charts, such as government's exhibit 10-0, which was a comprehensive chart of the doctors' many prescriptions to all their patients. Government's exhibit 10-25, which was the top 25 patients of Dr. Couch to receive abstral or subsist. So were we reviewing this issue for an abuse of discretion? The trial judge didn't permit the dead patient testimony to be received in evidence, to be considered by the jury, right? Well, that's part of it, is under the rules of evidence, yes. But under HERN, which references due process, there would be a de novo analysis. Didn't HERN involve a state evidentiary rule, and we distinguished HERN in our case in United States v. Metrovic? Yes, Your Honor, you did. But in a later decision that Your Honor was on in United States v. Sercan, it still adopted the reasoning of HERN as still being a viable argument and found that, or assumed there was error, although in that case it was harmless error, it did find that there was error in applying it under a standard applying the federal rules of evidence. Why wouldn't we find it harmless in this case if the evidence was otherwise overwhelming? Your Honor, the evidence in this case was not otherwise overwhelming, given the totality of the facts and circumstances in this case. Referring again to the charts, those pervaded this case, and they were devastating to this case for two reasons. One, it presented the PDMP evidence, which I'll address later, which made up so much of the exhibits that the government relied on in their case. And two, the government used these charts to try and tell two stories, basically. They used charts like 10-0 to show prescriptions of all the patients and imply that all the patients and prescriptions the doctors were writing were illegal or bad or abusive, and then tried to limit the doctors to 14 or 25 or 28 patients through the other exhibits. Counsel, wasn't the government's position in the testimony that there was a certain percentage of the patients that were over-prescribed medication? Yes, Your Honor, there was testimony of an estimation of… Wasn't that their arguments as well? Potentially, but we were also charged and made the argument of that there were primarily and essentially a pill mill. Why didn't you object in closing arguments when the government made this statement? We called 14 patients in comparison to defendant only calling a few. I can't speak for why we didn't object to that case, and maybe we should have, but when still… Do you know what the government meant by that? The implication that we interpreted is that we either couldn't or just didn't call more patients, and we should have been allowed to do so. The appellants were allowed to call the patient witnesses they chose or identified, but we were limited to only those patients they identified, which essentially empowered the government to craft our witness list. The government was able to call patient witnesses that complained of the treatment from the doctors, yet when Dr. Couch could not call his own witnesses like Michael Tiller, a bedridden patient with a history of extreme conditions. Go ahead. I'm sorry. Well, the government did. I mean, it conceded and argued to the jury, in fact, that most of the patients were good patients and not patients that were overprescribed. I'm looking at the part of the… We're talking about some of the government's closing argument. This is a quote from the prosecutor's argument. He says, by and large, their patients were legitimate patients, and I told you that right from the start, and it has always been our contention that a majority of the patients that went there had legitimate pain needs and were in need of legitimate pain. I mean, the government conceded that most of the patients were legitimate, right? They made that argument, yes, Your Honor, but they presented evidence, obviously, of only negative aspects of the case, and we believe we should have been allowed to put on evidence like Michael Tiller that showed that these doctors were practicing real medicine, providing real relief to rebut, as Hearn discusses in one of its circumstances, to shed the government's arguments and evidence in a different light. We should have been provided the opportunity to provide a different light that this was not essentially and primarily a pill mill, as the government argued. Wouldn't that just be character evidence that you actually, your client, complied with good character on those other occasions? No, Your Honor. We would argue that it's collateral evidence, such as referenced in Hearn, as it shows an ongoing practice. It's not a character of the practice necessarily. It shows evidence of how these doctors conducted their clinic, that they were operating within the bounds of the law, that they were prescribing for legitimate medical purposes and within the usual course of professional practice. Talk to me about Dr. Altman. Yes, Your Honor. Altman, I know she, is that correct? Yes, Trisha Altman. Yes, Your Honor. She testified against your client, right? Yes, Your Honor. Evaluated your client's patients and said there was a lot of them that were substandard treatment. Was there, and then you had two employees, I think, that testified about a certain percentage of the patients being overprescribed, and one of them maybe even said they looked like they were overmedicated. What other testimony was there against your client, as far as concluding that your client was not following appropriate medical standards when prescribing the medicine? Well, in addition, Dr. Altman, the government did call Dr. Greenberg and Dr. Vora. They also presented many of their patient witnesses, either patients or family members of patients, to testify about their experience to provide a backdrop or a basis to say, Dr. Couch was treating me outside the usual course of professional practice. So if there's a problem with Dr. Altman's testimony, is there sufficient testimony otherwise for us to conclude that it was harmless if Dr. Altman's testimony was allowed to go in, that it really didn't make any difference? No, Your Honor, because, again, when looking at the entirety of the case, we weren't able to present the evidence to rebut the government's case. They were able to name and identify a narrow universe of patients to assess or address this practice, and we weren't allowed to rebut that. Even though they opened the door through bringing in all the prescriptions and essentially making all the patients fair game, we were then restricted to these certain patients, and we couldn't call other patients to rebut the view or tell a different story of how PPSA was a legitimate practice and they weren't operating as criminals. The prescription drug monitoring program data, that was admitted? Yes, Your Honor. And if we look at the data, is it just limited to data reflecting prescriptions for the 28 patients who offered evidence against your client? No, Your Honor. The data from the PDMP and exhibits brought in and charts presented encompassed all controlled substance prescriptions written by these doctors through the relevant time period. As Governor's Exhibit 10-0 shows, it shows a list of over 100,000 prescriptions for each doctor, which would defy logic to believe that could only apply to 28 or 14 patients in this case. Yeah, but you could argue that to the jury, right? You can make that argument. Didn't you make that argument to the jury? Yes, Your Honor, we did, but the argument in response to that is the government opened the door using this evidence. We should have been able to, because they are basically putting all the prescriptions and treatment at issue through that argument and evidence, we should have been able to rebut that by naming our own or bringing our own patients. And I presume, did you raise an objection to the government's introduction of the statistical evidence? Yeah, we objected from the forefront of all PDMP. But you haven't raised that specific issue on appeal, correct? It's only sort of the back-end problem that, well, if they got to do it, we should have gotten to do it? Yes, Your Honor. Basically, they introduced this evidence, and we should have been able to reply in kind. And I assume that your objection, forgive me that I don't recall, but I assume that your objection to the statistical evidence was this is irrelevant, this case is about a discrete number of people? Right, you're basically arguing that they can't have it correct both ways. Well, yes, so forget about the back-end problem. The front-end problem, they shouldn't be able to bring in their statistical evidence. In the first instance, you said it's irrelevant. Basically, what they're saying now in defense of the district court's ruling, that your stuff was effectively irrelevant. Your Honor, I see I'm out of time. You can continue. Your Honor, I don't recall specifically, but, yes, I do believe we did. And to top that off, the PDMP evidence, as we've noted in our brief, was inadmissible anyway and should not have come in, come before the jury. Why is it inadmissible if it's a business record, which is an exception to the hearsay rule, when it's not testimonial since it was not prepared, it's not evidence that was prepared by prosecution for trial? Well, Your Honor, in this case, the PDMP records do not meet the business record exception for two reasons. First, it has lack of trustworthiness on the face of the report. It says the Department of Public Health does not guarantee these records. But is that a lack of trustworthiness or just a, that's a neutral on trustworthiness? We're not going to say one way or the other whether it's trustworthy. It's just a disclaimer, right? That's not a foreswearing of trustworthiness, is it? It's just saying we're not going to say it. Well, Your Honor, I would equate it to if Nancy Bishop had got up, the Department of Public Health's witness had gotten up on the stand to basically testify, to repeat this information, it would be the same as her saying, this is what it says, but I don't know if it's true. I mean, and I think we would find that that would have some lack of trustworthiness to it. And additionally, the pharmacist's statements were not adopted by the Department of Public Health or relied upon, as the case law shows, to make them business records of the Department of Public Health. They didn't issue any payments, make any determinations, or take any action. There was no reliance, just a collection and providing. It was a conduit of information. All right. Thank you, Mr. Sewell. Thank you, Your Honor. We'll hear from Mr. Lotito. May it please the Court, Counsel. I'm going to address the couch issue about the exclusion of good patient evidence, but particularly focus on the exclusion of the undercover videos relating to Dr. Ron, which are basically an issue in and of itself. And I'm also going to address the issue about sentencing, which Judge Kugler questioned Mr. Sewell about. In the government brief, they state the interests of justice are served by putting the truth before the jury. In this trial, the government prevented that from happening in several ways. First, despite the sweeping RICO and conspiracy allegations, they basically limited this case to 37 cherry-picked patients out of over 8,000 patients that were treated by these doctors. Can you move that paper so we can see how much time is left? Learn something new every day. Second, in the motion in limine, it was expanded to exclude these undercover videos of Dr. Ron. Two agents posing as patients were sent to see Dr. Ron during the conspiracy period. Expecting to be prescribed opioids, they were not. Those videos, which were excluded from the jury being seen. Now, I have to mention a couple of things about them. One patient, Massino, saw Dr. Ron and reported pain levels of 7 or 8. He received a thorough exam, a detailed examination and history. He was told you needed a medical justification for opioids and none existed. And he was given a non-controlled anti-inflammatory ointment. Patient McDermott saw Dr. Ron during the same period with similar complaint levels. He actually had a medical justification for opioids. He had a shoulder that wasn't fused. He was not prescribed opioids. He was referred for arthroscopic surgery, received no opioid prescription. He was warned about opioid use and dependence and given a trial coupon. These videos basically dispel... Counsel, can I ask you a couple of questions? What you're telling us is in the record. With regard to your client, Dr. Ron, is that how you address him? Ron, yes. I know Dr. Greenberg testified against him as far as evaluating his patients. Is that right? Greenberg was the only witness on four substantive counts. Greenberg, after his testimony, said his own testimony was unreliable. The government put that in a motion. Yet they still argued about Greenberg's reliability in closing argument. And we raised sufficiency on all those counts. Greenberg took... My question, though, is with regard to Dr. Altman. Did Dr. Altman testify with regard to your client? She testified about two patients. One that was basically a patient of Dr. Couch. And her opinions basically were refuted in the evidence. She didn't have all of the facts from the various charts. And the two patients she discussed were... There's a question about those. Had these videos been presented, it would have resolved all those credibility decisions in Dr. Ron's favor because that's what the jury was being asked to decide here. Is it not the same thing that I asked about before? It's basically just good character evidence with regard to some of the patients? Well... You would have argued that, you know, my client has good character because, look, he did it correctly here. There are these cases. I know what Your Honor is referring to. But there are cases like Riley and Sheffield where other instances are admitted to show intent, particularly in broad cases of conspiracy. Now, when it's a substantive account like a drug deal or a bank robbery, I understand that reasoning. But in a broad conspiracy count, this type of evidence to show somebody's intent, were they limited to the worst possible patients they could find out of their counsel? Why didn't you object, or the counsel that was representing him at trial, when the government made the statement, and I'm going to ask the government why they made this statement, about the fact that they had called 14 patients in comparison to the defendant only calling a few? Why wasn't there an objectionary approach? So the judge could have taken action at that time. Well, I think it should have been objected to. But in this Court's decision in U.S. v. Paquette, that's the Miami airport case where drugs are found, a kilo of cocaine in a bag. The person says, that's not mine. That's excluded. Then in closing argument, the government says, there was no objection. There was no denial that those drugs were in there. That was not objected to in closing argument either. Yet, this Court reversed that on a fairness basis, similar to what happened here. You can't get a ruling to keep out evidence and then criticize the defense for not bringing it in. I understand that, but my question is, why didn't you point it out to the district judge at that time? So hopefully, the district judge could have had an opportunity to fix the issue at that time. It was difficult to decide whether to object in closing, but it was not objected to in Paquette, and that didn't stop the Court from reversing. I wanted to mention the case of South Carolina v. Holmes, which builds on the reasoning of Hearn. That's the case where the Supreme Court unanimously reversed a conviction for murder, and they basically said that, because the defense was not able to show someone else committed the murder, by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt. That's exactly what we had here. They presented all of this cherry-picked evidence. About a broad RICO conspiracy, the defense was not able— we had an expert that was going to say he looked at 50 patient files, and he couldn't identify one prescription that was written outside the usual course of professional practice. I want to turn to— that issue about the videos requires reversing all counts on Dr. Ron, because his credibility was called into question by not having those admitted. The sentencing was based on phantom testimony. I want to address what Your Honor's question was about the 50%. The two witnesses who testified, Parker and Palmer, their testimony was 50% of the patients either were over-medicated or appeared over-medicated. The prosecution represented at sentencing— and that's the first time I met Dr. Ron— that the testimony was that 50% of the prescriptions were not written for a legitimate medical purpose, all based on that one cryptic thing about over-medicated or appeared over-medicated. The judge said, oh, I recall that testimony, and based on that, she extrapolated from total prescriptions. She took 10.8% of total prescriptions. We cite Shoeby, a Seventh Circuit case, which basically makes the distinction. When you're dealing with doctors who are dispensing legitimate drugs versus street drugs, you have to have reliable evidence, and you can't extrapolate just because some may have been unlawful, all or others were unlawful. That's exactly what happened here. It was phantom testimony that was used as the basis for calculating the drug quantity. All they did was, at best, prove about 16 prescriptions from the indictment. We make the argument—and also I point out the case Frazier. Even in street drugs, this court requires more than just cryptic testimony to base a drug quantity calculation. Could the judge also have relied upon the other witness that testified about the over-prescribed medication? These were the two witnesses that testified about— The other one that testified about over— wasn't there a witness that didn't just say they looked over-medicated, but there was one that said there was, in their opinion, a certain percentage of the patients that were over-prescribed medicine? They said over-medicated, which could mean a slightly higher dose. It could mean a dosage for a longer period of time. It doesn't mean not for a legitimate medical purpose. Both of those witnesses, Palmer said the PPSA provided good quality of care to all patients. Parker, the other witness, said she never did anything intentionally wrong to hurt patient care. I reserved some time for rebuttal, and I'll— Ms. Ralston. Good morning, Your Honors. May it please the Court. Sonia Ralston for the United States. I'd like to start where we left off there, just on the sentencing thing, because I think it's rather simple. The calculation—the testimony is at least half from Palmer and Parker, and you can find that in the transcripts at page 2995 and 3939 to 3940. So they say appear over-medicated. These are medical professionals. They're nurse practitioners. They're not just laypeople off the street. So they're trained, I think, to recognize when someone is over-medicated. And if you are over-medicated, that is, by definition, taking medication that is medically unnecessary. Something that is more than needed is unnecessary. So I think that it's not a leap from over-medicated to medically unnecessary. But moreover, the District Court didn't have to go all the way to that 50 percent figure to get where it got in the sentencing guidelines. 10.6 percent was enough. And the Court, I think, made conservative, accurate, fair estimates, as this Court requires in Barsom. The Chub—I think Chub—or Chubais case from the Seventh Circuit, both that and Rosenberg cited in reply, neither involved conspiracies. They're both straight-up substantive counts. So I think that's different than this case. Also, you know, forging prescriptions is outside the usual course of professional practice. There's testimony that Palmer forged over 25,000 prescriptions for controlled substances. What was the evidence with regard to the percentage of patients that were over-prescribed medication, that were prescribed medication when they either didn't need it or that type thing? You said 50 percent. If we don't buy the argument of 50 percent, you said the judge only had to come up with 10-point-something. I assume that's to equal the guideline so that the sentence would be within the guideline range? Well, that's to get to the guidelines range that applied. The sentence imposed—and this is the other argument— was substantially below the guidelines range. And the Court issued a keen statement that it would have imposed the same regardless. Right. All right. So what do you believe with regard to restitution, for instance, other things? What was the judge thinking? What was the percentage that the judge actually ended up thinking? So I think the restitution is a little bit different the way they calculated it. But, you know, it's not just medically unnecessary, right? It's medically unnecessary or outside the usual course of professional practice. So you have this 50 percent figure on the medically unnecessary. Then we have the 25,000 forged prescriptions. We have all of the prescriptions for sepsis and abstral that were issued based on financial incentives, which is outside the course of professional practice. And because those are fentanyl, they count very heavily towards the guidelines quantity. And I think that those things alone would get you to the 10.6 percent. I haven't broken out the math precisely because that wasn't their precise challenge. But if the Court wants, we could go back and do that. Go ahead, Judge. I was going to say, wouldn't the district judge need to tell us what the district judge was thinking so that we could evaluate it? So I think what she was thinking was that there was testimony that at least half appeared over-medicated. She says, I remember that testimony. She sat through the seven-week trial. She was exposed to all of the evidence. I think she was in the best position to make the determination about how much illegal prescribing was going on. And to say that at least 10 percent of what passed through this clinic was illegal or inappropriate, either financially motivated or medically unnecessary, is not a stretch based on the evidence from all of the patients and their families and the experts and the clinical staff. So I think that also it's a conspiracy. Dr. Ron wants to say, well, Palmer was only involved in Dr. Couch's patients, but it's a conspiracy, so they're both liable for the whole thing. So just, I mean, there's sort of two things going on here. One is the amount of loss, or sorry, drug quantity, and the other is the restitution. So far, I've been sort of tracking, yes, yes, yes, lots of testimony. The half is going to get you north of 10.6. But how about restitution? I mean, I recognize it's only got to be a reasonable estimate, but the math is pretty fuzzy, it seems to me. Okay, so on the restitution, they're talking about the TERF prescriptions only. So that's only the high-intensity fentanyl. They say they take that total number, subtract 15%, because the testimony from a couple of witnesses said up to 15% of the patients had cancer, so that would be the on-label use, and then divide the remaining amount by half based on this at least half statement. I think that's actually an underestimate because of the financial motives which infected every single one of those prescriptions. The reason I'm asking the question is that it seems like if your challenge is to get north of 10.6, then you've just got to show lots of badness, and we're north of 10.6. If your challenge is instead to put a reasonable estimate on a number, it just seems like when we're relying on this little bit of testimony, about half over-medicated, it's just kind of like, oof, it feels awfully squishy. So I think for that, when we're talking about two different charges, so for the guidelines thing, we're talking about the drug quantity for drug dealing, and for the restitution, we're talking about the fraud. So the fraud to the insurers, I think... But both hinge on the half over-medicated thing, right? Kind of. So I think that the half over-medicated thing as to the fraud is actually a vast understatement of the amount of fraud because there was a lot of testimony that the insurers weren't going to pay for these prescriptions if they were off-label because they were so expensive. And that's where you get the 15%. So once we've excluded the 15%, everything that remains is off-label, which is arguably fraud. Taking it down by half... Wait, wait, wait. I mean, is off-label necessarily fraudulent? So there's testimony from the insurance companies that, yes. So let me just see if I can point you to some pages. The... I mean, aren't lots of meds prescribed off-label? Absolutely, and it's not illegal in a drug distribution sense. The question is whether they told the truth to the insurance companies about that. And we have these instances, particularly about Burns, Ivy, and Barber, where they falsely certify that the patients have cancer in order to get the insurance companies to pay for it. And I'm sorry I don't have that page right in front of me at the moment, but there are cited in our brief where the insurance companies said that they would not pay for the off-label usage. There was some conflicting testimony going back and forth about that from different people. So if you look at UnitedHealthcare and Medicaid, they often denied payment at 51-87 to 88. Blue Cross Blue Shield sometimes approved fentanyl but not TERF at 27-29. So I think there was basis for the court to conclude that those TERF prescriptions were inappropriate, that the charging of the TERF prescriptions to the insurance companies were inappropriate. And the kickbacks, again, I think that affects everything. So every single substance prescription, I think, could be seen as fraud because it was prescribed on the basis of their financial incentive, not on the basis of patient need. Can I ask you a couple questions? Yeah. The way that you get to this figure, 50% or whatever, you rely on the two nurse practitioners and the experts, and then you say the insurance records showing the overprescription or off-label prescriptions. If you take out your experts and the jury doesn't believe the two nurse practitioners, what evidence do you have to support the convictions? To support the convictions? Yes. Okay, so we're not talking about sentencing anymore, going back to sufficiency. To support the convictions, we have three different experts who testify each about different prescriptions, different patients. And they haven't challenged the testimony of Dr. Vora, who testifies about, I think, five patients. Dr. Altman. Did Dr. Vora evaluate all the other patients or just those five? No, each expert evaluated a discrete set of patients. There wasn't overlap. With regard, let's talk about Altman. Okay. You objected or the government objected to the defense being able to ask the question from 2000 to 2014 or some period of time, approximately 10 to 14 years. The government had DEA specifically, I believe, had paid that expert $325,000 during that period of time. Is that right? Am I missing it? Close, but not quite. So I refer you to pages 4509 to 4510 of the record where this transcript takes place. So she testified that she had worked for the government from 2002 until this trial's period of 14 years. She testified previously on direct that she had worked on five or six cases with the DEA and one or two with the DOJ. For the past year. In the past year, yes. She testified that her fee in this case was $7,600. Right. And the objected to question was two questions. So first, when you work for the government, how does it work? You set up these contracts that authorize an amount up to a certain amount and then you bill by the hour for your work done. Yes, that's correct. Next question. And over that period, you had total contracts of up to $325,000. Up to or? Contracts. Of $325,000. Yes. Not up to. Well, the first question is what is the contract? The contract is up to an authorized amount. Yes. So the contracted amount is just a ceiling. How much money did she make during that period of time, 12 years? It's not in the record. Okay. Because the judge prohibited the defense from asking that question? No, Your Honor, because they never came back and tried to ask the specific question. They asked the broad ceiling question. They didn't ask the what did you actually make question. All right. So that number is in the record. You're saying that the district judge, the ruling that I read, was not sufficient to tell the defense they were not going to get into that. Is that what you're telling me? The specific question that was asked was about the total contract value. The objection was to that question and that objection was sustained. Do you think that is not something that a jury is entitled to know about the relationship between that doctor and the DEA when they're making an evaluation as to the credibility of that witness? I don't think it was an abuse of discretion, Your Honor, because the relationship was well established. One year. For one year. For the past year, but also over the 14 years, the period that she had worked for the government as a witness, it was established that this had been a long-term relationship. And the bias that is, if you look at the Collins case that they cite in reply, the bias is about the relationship. It's the idea that the witness is going to color her testimony to get future jobs. I understand bias. Let me ask you because I don't want to run you out of time and I'm sure other questions need to be asked. Greenberg, the government took the position after the witness testified that that witness was not competent. Is that correct? No, Your Honor, that's not correct at all. What was your position? So our position, and this is at page 1068 to 1070, that Dr. Greenberg alerted the government that he self-suspected he might have early-onset Alzheimer's. The government reported this to the court and the defense. He was going to be evaluated by a neurologist. There's this colloquy before the jury comes in, and they say, okay, what should we do about this? And the defense counsel said, I don't see anything here, and the judge said it or something. But did the jury not have a right to know that? Certainly not over the defense counsel's objection, which was Dr. Couch said you shouldn't do anything about this. Dr. Ron didn't make an advocation that you should do something about it. The court affirmatively found that there was more than sufficient evidence that he was competent and said, let us know if anything else developed, and nothing else developed. Nothing came of it. All right, my final question to you, and then I'll be quiet. Why did the government make the statement in closing arguments? We called 14 patients in comparison to the defendant calling a few. Why? The defense had made arguments through their case that they should be able to call other patients to show that this isn't something that every patient, and I know there was testimony. Your position, the government's position was that a lot of the patients, maybe even most of the patients were treated appropriately. But why did the government make that statement in closing argument? What was the purpose of that statement? So the purpose of that statement, I think you can see this in the rebuttal closing, obviously an off-the-cuff statement. You can see in the next line where she says, take Ben Brown, which is one of the charged patients that the defense called in their defense, and then she talks about what happened with Mr. Brown. Mr. Brown said Dr. Justin was his Justin, and that's the nurse practitioner. And in context, what she, I think the fair way to read it is that of the charged 38 patients, or 37 if we want to quibble, that we called 14 and they called a few. So of that universe that we're talking about. But that's not what she said. That is not what she said, and I understand. And it was in rebuttal, so that means the defense did not have an opportunity to get up and rebut what she said. That's true, Your Honor, but it wasn't objected to. They haven't even challenged on appeal the statement, closing argument. Well, I know, but we're evaluating whether or not, they say they should have been permitted to call these other witnesses about other patients and whatnot, and that it caused harm when you objected to government, and the court didn't let them put on this other testimony. And then the government, knowing that's their position of objection, makes that kind of statement in closing argument. Do you really think that's fair? Your Honor, I don't think it changed anything about the color of the trial. This trial went on, remember, for seven weeks. Throughout the trial, there are statements by the government, in opening and closing, throughout with the witnesses, that many, many of the patients were legitimate, that they had legitimate needs, that they came for legitimate treatment, that they were treated properly. So that, I think, was well before the jury. The charge from the district court, the jury instructions, were very specific about the government's burden. I don't think there's any reason to think this changed anything, and most importantly, under Rule 403, the court has broad discretion, the district court, and its rulings can only be overturned if they are unsupportable. I don't think this ruling was unsupportable, given the breadth of this trial, and she was there, she saw, she knew what the jury was seeing, what was going to be confusing, what was going to be a waste of time, and I don't think her rulings are unsupportable. Think about, they want to say that the government crafted the witness list by making this list of patients. The government always crafts the witness list when it makes a charging decision. Just because somebody robbed five banks, they don't get to come in and say, well, I passed three other banks today and I didn't rob those. That's not relevant. I agree 100%. My problem is that the government appears to have made that an issue, if you will, to be held against the defense when they made the statement, we called 14, how many did they call? I understand, Your Honor, and I agree in an ideal world that statement wouldn't have been made, but the fact of the matter is that in the course of the trial, I don't think there's reason to think that that changed anybody's impression about the evidence. Okay, I'll hush. You can go on with the rest of your argument. So pulling off that 403 point, I just want to point out that in Holmes v. South Carolina, the Supreme Court explicitly approved Rule 403 as a limitation on evidence. We're talking about Hearn and this idea of what the standard of review is. It's abuse of discretion. The rules of evidence govern, and the district court here did not abuse her discretion. I'd like to talk briefly about the PDMP records. It seems that if the court had any questions about the business records or otherwise the hearsay aspect of that. Okay, it doesn't seem like it. And I wanted to point out one other thing about Dr. Greenberg, this idea that he called himself unreliable or the government called him unreliable. That's not true. If you look at page 1070 of the record, there's a clarification that he says he did not use the word unreliable. So that's not what happened. I just wanted to be clear about that. The expert witness, you know, it is harmless. The substantive counts that she testified about, Dr. Kelly, or not Dr. Kelly, but the undercover officer Kelly, you know, he came in, he presented the video evidence, he testified. I don't think there's any reason to think that they needed the expert's testimony to overcome or to convict on those substantive counts. The fee issue, you know, this relationship was before the jury and it wasn't, they didn't bring this up in closing argument even to argue that she was biased. So I don't think it was something that leaves, that the missing question leaves a significantly different impression on the jury than what was already in the record and that's the standard. Are there any questions about the jury instructions or any of the other matters? Seeing none, we ask that you affirm. Thank you, Ms. Raulston. Mr. Lotito, you're going to provide the rebuttal? Yes. I will try. I'll try to address a couple of points on the sentencing issue about over-medicated. The testimony was over-medicated or appeared over-medicated. It was represented at sentencing to be something entirely different, that half the prescriptions were written not for a legitimate medical purpose. There was no testimony that said that. They extrapolated from that over-medicated testimony. They could have fleshed this out as to what it meant. I suggested it could mean slightly higher dose, longer than necessary dose. There was testimony throughout this trial. There's no medical consensus on most of these things. To use that and extrapolate 10.8% of total prescriptions runs counter to this court's decision in U.S. v. Frazier. It runs counter to Chuby, and it runs counter to any notion of fairness. She talked about greed and mentioned Abstral. She's completely wrong. We cite in pages 5 and 6 of our reply brief that various insurers, including Medicare, approved off-label usage for Abstral and Subsys. The prosecution even said during this trial, there's nothing wrong with off-label. Agent Burt said that. Another DEA agent that testified said that. Their own expert said that. That's off-label use. These doctors believe that that was the best pain relief for breakthrough pain of any kind, cancer or otherwise. They make a misstatement in their brief that the doctors are certifying they're only prescribing it for cancer. They're acknowledging it's only approved for cancer, but it can be approved off-label. I point that out in our reply brief. We had 15% of total patients that had cancer. Abstral and Subsys were prescribed only to 77% of those. If these were greedy doctors, they could have easily gotten approval for that. They didn't do it because many of the cancer patients just didn't need it. They used coupons to give free medication to many patients that couldn't afford it. She makes a reference to Burns. Burns was approved. The DEA agent said there was no false information provided. All of the credibility decisions would be resolved in Dr. Ron's favor if the undercover videos that they obtained had been played for this jury. I commend two things to the panel here. One, look at those videos, and you'll see a skilled, professional, nationally recognized pain management doctor. Second, read his own allocution at his sentencing. You will also see that he's a brilliant, conscientious doctor that does not deserve to have a 252-month sentence that he served exactly 30 months of already. Please reverse his conviction. Thank you. Thank you, Mr. Lotito, Mr. Sewell, and Ms. Raulston.